## MARY BAME JONES v. CHARLES L. SEAGROVES

### No. 7211SC484

### (Filed 14 March 1973)

**1. Trial § 16— instruction to disregard testimony — no exclusion of competent evidence**

In an action to recover for personal injuries allegedly sustained when plaintiff was struck by an automobile driven by defendant, the trial court's instruction that the jury should disregard a witness's testimony as to what transpired "after she was placed in the ambulance," given after the witness disclosed that she had not gone in the ambulance with plaintiff, did not result in excluding competent evidence as to the condition of the plaintiff immediately following the accident and during the succeeding months, the witness thereafter having been allowed to testify in detail as to plaintiff's condition at the times the witness saw her while plaintiff was hospitalized during the months following the date she was injured.

**2. Automobiles § 45; Evidence § 33— hearsay evidence — inadmissibility to show defendant's reaction**

In an action to recover for personal injuries allegedly sustained when plaintiff was struck by an automobile driven by defendant, testimony that immediately after officers stopped an automobile driven by defendant, a passing motorist told the officers in defendant's presence that a woman was lying in the highway just up the road was hearsay and was not admissible for the purpose of showing defendant's reaction to the statement where the evidence shows that the officers left abruptly and that defendant "went on towards home."

**3. Trial § 35— instructions defining "greater weight of the evidence"**

The trial court's instructions defining the term "greater weight of the evidence" were correct when read contextually and did not constitute an expression of opinion on the evidence.

**4. Negligence § 7— willful or wanton negligence — instructions**

Failure of the court to apply the law to the evidence as to defendant's willful and wanton conduct in one portion of the charge was not error where the court instructed the jury on willful and wanton conduct in another portion of the charge.

APPEAL by plaintiff from *Brewer, Judge,* 31 January 1972 Civil Session of Superior Court held in LEE County.

This is a civil action to recover damages for personal injuries sustained by plaintiff when she was struck by an automobile at about 1:45 a.m. on 24 October 1970 as she walked along U.S. Highway No. 1 By-Pass at a point approximately two miles south of the City of Sanford, N. C. In her complaint as originally filed plaintiff alleged that defendant was the

driver of the automobile which struck her and that he was negligent in failing to keep his vehicle under proper control, in failing to keep a proper lookout, in operating at a speed greater than prudent under existing circumstances, and in other respects. Defendant denied all material allegations of the complaint and as an affirmative defense alleged that if he drove his automobile into the plaintiff, which he expressly denied, then plaintiff was contributorily negligent in walking, standing, or sitting in the northbound lane of a heavily traveled highway in the nighttime.

Plaintiff's evidence showed the following: In the area where she was struck, U. S. Highway No. 1 By-Pass runs north and south. Plaintiff lived with her mother and brother in a house located a short distance east of the highway. A dirt access road connected the house with the highway. This road ran westward from the house toward the highway for a short distance and then turned and ran southward for several hundred feet until it intersected with a crossover road. At the point where the crossover road crosses the highway, U. S. Highway No. 1 By-Pass is a four-lane highway, with two lanes for northbound and two lanes for southbound traffic separated by a median. Northward from the intersecting crossover the median gradually narrows until, at a point approximately 988 feet north of the intersection, it terminates altogether and U. S. Highway No. 1 becomes a two-lane highway, with one lane for northbound and one lane for southbound traffic. Just north of the point where the highway narrows to a two-lane road, there is a picnic area adjoining the highway on the east.

Shortly after 1:50 a.m. on 24 October 1970 two deputy sheriffs, who were alerted by a passing southbound motorist, found plaintiff lying in the northbound lane of the highway at a point approximately 103 feet north of the north end of the median and approximately 1,091 feet north of the point where the crossover road, which connects with the access road leading to plaintiff's house, crosses the highway. Her head was approximately three to four feet from the eastern edge of the paved portion of the highway. Her clothes were torn and she was severely injured.

Plaintiff testified that she had been going with defendant for approximately a year prior to October 1970. She is an alcoholic and defendant drinks. In the evening of 23 October 1970 she drove with defendant in his car to Sanford, where they

purchased whiskey and wine. They returned to her house, where they sat in the front room talking. Her mother and brother were in other portions of the house. Sometime after midnight defendant began to argue and slapped her on the face. She walked out of the house, intending to go to a telephone to call the sheriff's department. She went on the dirt access road to Highway No. 1 and started walking on the shoulder of the road northward toward Sanford. After she got on the highway she saw defendant. She testified:

> "When I first saw him again after I had left him at my home, he was driving slowly behind me. I saw the lights coming up the access road. When he got to the highway, he followed me. He turned North on the highway. I really don't know the distance that I was from that access road going North when he got behind me, but he would get close and then he would drop back. He would slow up and then he would speed up again. I don't know how far this continued, I think it was probably down close to the picnic tables somewhere where he hit me. At this point I was walking . . . on the shoulder of the road. He was driving on the highway. I believe he was in the right-hand lane for traffic going North. When I got down somewhere in the vicinity of the picnic tables, I realized that he was getting so close behind me I made a dash for it and tried to run and the next thing I knew I was hit and I didn't remember anymore.
>
> "Charles Seagroves hit me. I recognized—a red cardinal on the front end of his car. I knew that it was him by that. He spoke to me out there on the highway. I was just before crossing over to try to get to the other side of the road when he first spoke to me out there on the  highway. He said, 'I've got you now, you—.' When I started to cross over the highway I ran. When that car hit me, I think I was knocked unconscious. I don't remember anything until Mr. Currin and Mr. Stone was there and my mother."

Deputy Sheriffs Currin and Stone testified that at 1:50 a.m. on 24 October 1970 they were parked in their patrol car with its lights off in the crossover on the west side of the highway, facing eastward toward the southbound traffic lanes. They observed a car, later determined to be defendant's, parked in the curve of the dirt access road leading from plaintiff's house. It was in the portion of the road which ran westward

from the house. Its headlights were shining westward toward the highway, and it was about 105 feet from the place plaintiff was later found lying in the highway. Between the car and where plaintiff was later found there was grass and a kind of low incline. Defendant's car remained parked with its lights on for approximately five minutes, during which time no other traffic passed on the highway. It then made a sharp left turn and came south on the dirt access road to the crossover, where it turned right into the crossover and came across the northbound lanes into the southbound lanes. It then turned left, passing in front of the parked patrol car in which the deputies were seated, and proceeded south on the highway. Defendant was the driver and was the only occupant of his car. The deputies followed defendant's car south on the highway, turning on their blue light and siren. About a fourth of a mile south of the crossover, defendant pulled his car to the right and stopped. The deputies stopped their patrol car just behind defendant's car, got out, and walked up to defendant's car. As they did so, defendant rolled his window down. Just then, another car, traveling south on the highway, pulled up beside the deputies and the occupants of this car reported to the deputies that they had seen a woman lying in the road. The deputies then left defendant and drove in their patrol car back north on the highway until they found plaintiff lying in the road. About the time the deputies reached her, plaintiff's mother came up. The plaintiff was conscious at that time. She told Deputy Stone that "it was Charles that did it."

Plaintiff's mother testified that plaintiff and defendant came back to her house from the liquor store about 10:00 o'clock. She heard them fussing in the front room. She heard the door open and shut and in a little while heard it open and shut again. She went out into the yard, and about that time defendant drove back to the house alone. Defendant told her he did not know where plaintiff was. She went down the dirt road to the curve, looking for her daughter, and then started back to the house to wake up her son to help her. As she did so and when she was between the curve and the house, defendant passed her. He stopped when he passed, and she again asked him where the plaintiff was. Defendant said that "Mary was lying down there at the picnic table and he was going over there . . . and kill her." She then ran to the house and woke up her son and got her coat. When she came back out of the house, she heard her daughter hollering for help. She ran and

found plaintiff "laying there in the road between the picnic table and where the road joins to go north and south." About that time the two deputy sheriffs came up.

Defendant testified in substance as follows: After he and plaintiff returned from Sanford, where they purchased whiskey and wine, they sat in the front room of plaintiff's house until about 1:00 o'clock. They then went out and sat in his car, listening to the radio and drinking. Plaintiff's mother came out to the car and wanted him to leave. Defendant wanted to go, but plaintiff wouldn't get out of his car. Plaintiff "got mad and she was pretty well drinking, throwed the door open and got out and left."

"I remained at Mary's home about 15 minutes, 10 or 15 minutes, after she got out of the car and left. During that time I was talking to her mother. Her mother wanted me to look for her and I said I wasn't going to look for her because she had run off before that way and that I wasn't going to look for her. She had run off before lots of times when she got pretty well intoxicated."

Defendant then left the house, drove down the dirt access road to the highway, then across to the southbound lane and turned south. After he had driven south about a quarter of a mile, the deputy sheriffs stopped him. The deputies' car stopped almost at the back of his car. Another car passed, slowed down, but did not stop. Defendant did not hear anyone in that car say anything to the deputies. The deputies then left and went back north on the highway. Defendant did not know why they left. He then drove home. On the following day he first learned that plaintiff had been hit when he was given this information at the Siler City Police Station. Defendant denied he had seen plaintiff at any time on that night after she left his car, denied he had ever operated his automobile behind plaintiff on the highway, and denied he had at any time run his car against or over her.

Other evidence will be referred to in the opinion. At the conclusion of the evidence the court allowed plaintiff's motion to amend her complaint by adding an allegation that "[t]he defendant was operating his car with willful and wanton conduct, purposely and deliberately striking the plaintiff with his car."

The court submitted four issues to the jury as follows:

"1. Was the plaintiff injured and damaged by the negligence of the defendant as alleged in the Complaint?

"2. If so, did the plaintiff contribute to her own injury and damage by her own negligence as alleged in the Answer?

"3. Was the plaintiff injured and damaged by the willful and wanton conduct of the defendant as alleged in the Complaint?

"4. What amount, if any, is the plaintiff entitled to recover of the defendant for her injury and damage?"

The jury answered the first issue in the negative, and from judgment that plaintiff take nothing by this action, plaintiff appealed.

*Pittman, Staton & Betts by William W. Staton for plaintiff appellant.*

*Hoyle & Hoyle by W. D. Sabiston, Jr. for defendant appellee.*

PARKER, Judge.

[1] Plaintiff's mother testified that her daughter was conscious when she was found lying on the highway and that "she stayed conscious until they picked her up and put her in the ambulance and then she went in a coma." In answer to further questions on direct examination, to which no objections were made, this witness then testified that plaintiff was not conscious after she got in the ambulance, that she remained unconcious about two months, and that she was taken by ambulance to the Lee County Hospital. When it developed from the witness's answer to the next question that she had not gone in the ambulance with her daughter, defendant's counsel moved to strike her testimony "as to what happened in the ambulance." The court allowed the motion and instructed the jury to "disregard the testimony of this witness as it relates to what's transpired and what was said in her testimony as to her observations of the plaintiff, Mary Jones, after she was placed in the ambulance." This instruction is the subject of appellant's first assignment of error. Appellant contends that the court's ruling was so broad that it resulted in excluding "competent,

relevant and material evidence as to the condition of the plaintiff immediately following the accident and during the next two months." We do not agree that the court's ruling was either intended or that the jury could have understood it as being so broad as to have the effect of which appellant now complains. It was proper to instruct the jury to disregard the witness's testimony as to matters of which she could have had no personal knowledge. That this was the only effect of the court's ruling was made manifest by the fact that immediately following the ruling the witness was permitted to testify in detail and at length concerning her daughter's condition at the times the witness saw her in the Lee County Hospital and in the North Carolina Memorial Hospital in Chapel Hill during the weeks and months following the date she was injured. Appellant's first assignment of error is overruled.

[2] After defendant testified and rested, plaintiff called one of the deputy sheriffs in rebuttal. This witness testified: When he stopped defendant on the highway, the deputy got out of the patrol car and walked up beside defendant's car. Defendant was lowering the window. At that point another car, going south, pulled up just beyond the witness, partially in front of and partially even with defendant's car. The driver of this car, who was then approximately six to eight feet from the defendant, said something in a loud voice, which the deputy, who was two or three feet from the defendant, had no difficulty in hearing. The court sustained defendant's objection as to what the man in the car said. If permitted to answer, the witness would have testified that the man in the car said to him: "There is a woman laying in the highway just up the road," and when the witness asked him how far, the man said "about a half a mile." The exclusion of this testimony is the subject of appellant's second assignment of error.

If "the assertion of any person, other than that of the witness himself in his present testimony, is offered to prove the truth of the matter asserted, the evidence so offered is hearsay. If offered for any other purpose, it is not hearsay." Stansbury, N. C. Evidence 2d, § 138. Here, appellant contends that evidence as to the statements which the passing motorist made to the officers in defendant's presence was competent, not to show the truth of the matters asserted in the statements, but rather to show defendant's reactions to the statements. The record shows, however, that the deputy testified that "[a]s a

result of what I heard the man say, I immediately got back into my car and got into the northbound lane and went north." The only evidence in the record as to defendant's reactions to the passing motorist's statements, assuming the jury should have found that he heard them, indicates that when the officers thus abruptly left, defendant simply "went on towards home." (Efforts of plaintiff's counsel in cross-examining defendant to show that he followed an unusual route on his trip home were unavailing.) We cannot, as appellant's counsel seek to do, equate this "reaction" of defendant with the flight of a guilty person nor do we think it could have had sufficient probative force tending to discredit the truthfulness of defendant's version of what had previously occurred as to make the exclusion of evidence of the statements made by the passing motorist prejudicial error. If error at all, it was in our opinion, not so prejudicial as to require a new trial. Appellant's second assignment of error is overruled.

[3]   Appellant's third assignment of error relates to a portion of the court's instructions to the jury given in defining the term "greater weight of the evidence," as it relates to the burden of proof. Appellant contends that the portion excepted to "appeared to instruct the jury to find that the plaintiff had not sufficiently met the burden of proof" and "could possibly be interpreted as an expression of opinion" in violation of G.S. 1-180. We do not agree. When read contextually, we think the charge correctly defined the term "greater weight of the evidence," and that the jury could not have been in any way confused or misled into believing that the court had expressed an opinion as to the evidence in this case. Appellant's third assignment of error is overruled.

[4]   Finally, appellant excepts to the court's charge on the first issue, contending that in this portion of the charge the court failed adequately to apply the law to the evidence as to defendant's willful and wanton conduct. We note, however, that in a subsequent portion of the charge the court did correctly define willful and wanton conduct and we do not think the jury could have been misled by the charge.

The evidence in this case was in sharp conflict. While plaintiff originally brought her action on the theory that she had been injured by defendant's negligence, her evidence would show him guilty of a deliberate and criminal assault. Defend-

ant's evidence would show him guilty of nothing. No exception was taken to the issues as submitted. It would appear that the jury accepted defendant's version of what occurred. In the trial we find no prejudicial error.

No error.

Judges VAUGHN and GRAHAM concur.